**In re Kenneth A. MARTIN, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 420600).**

**No. 11–BG–775.**

District of Columbia Court of Appeals.

Argued April 4, 2012.
Decided March 28, 2013.

---

Daniel Schumack, Fairfax, with whom Pamela J. Bethel, Washington, was on the brief, for respondent.

Julia L. Porter, Senior Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Judith Hetherton, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before FISHER and BLACKBURNE–RIGSBY, Associate Judges, and KING, Senior Judge.

KING, Senior Judge:

Bar Counsel charged respondent Kenneth A. Martin with violating Rule of Professional Conduct 1.5(a) by charging his client an unreasonable fee, Rules 1.15(a) and (c) for comingling funds after the client disputed the fee, Rule 1.16(d) by failing to promptly return client funds after the Attorney–Client Arbitration Board ("ACAB") awarded the client the unreasonable portion of the fee, Rule 8.4(c) by falsely testifying that he received advice from the D.C. Bar Ethics Hotline to retain the disputed funds in his operating account, and Rule 8.4(d) by requiring the client to withdraw a bar complaint against him pursuant to a settlement agreement. The Hearing Committee found Martin violated all rules except Rule 1.5(a) (charging an unreasonable fee) and recommended a one-year suspension with reinstatement subject to disgorgement of the funds awarded by the ACAB. The Board on Professional Responsibility ("Board") found Martin violated only Rules 1.5(a), 8.4(c), and 8.4(d) and recommends a sixth-month suspension with reinstatement subject to disgorgement of the unreasonable fee. We sustain all of Bar Counsel's charges and impose an eighteen-month suspension with reinstatement subject to disgorgement of funds awarded to the client by the ACAB.

## I.

Enterprise Solutions, Inc. ("ESI"), retained Martin to represent it on various matters starting in February 2000. Under a February 20, 2000, retainer agreement, Martin billed ESI at an hourly rate of $125–275.[1] Pursuant to this agreement,

---

1. In the initial fee agreement with ESI signed on February 20, 2000, Martin agreed to ac-

Martin defended ESI in a lawsuit filed by Herbert Cannon, a former ESI consultant, for breach of contract, and ESI later filed a counterclaim. Cannon filed suit in Florida, and because Martin was not a member of the Florida bar, he retained Florida counsel Luis Sergio Konski of the law firm Becker & Poliakoff as associate counsel.

On December 11, 2001, ESI signed a second fee agreement whereby Martin received "a 45% contingency fee interest" in "[ESI's] litigation against Herbert Cannon." ESI and Cannon reached a settlement in which Cannon agreed to pay ESI $2.2 million. The settlement agreement, however, allowed ESI to collect the judgment by executing only against assets held in the name of Rowen House, Ltd. and Montville, Ltd., two New York brokerage accounts with Wall Street Equities, Inc., which belonged to Cannon. Because Martin was not a member of the New York bar, Martin helped ESI separately retain New York counsel Fred Van Remortel to represent ESI in the action to collect judgment against Cannon. Contemporaneously, the United States filed a civil forfeiture action against the same Rowen House and Montville brokerage accounts to satisfy a judgment the government had received against Cannon in a separate action. As a result, as the Hearing Committee summarized, "the federal government and ESI each sought payment or satisfaction of its judgment against Cannon from the same funds."

On May 3, 2002, ESI and Martin entered into a third fee agreement in which ESI agreed to pay "from $165–$295 per hour" "regarding the law suit filed by the United States government for forfeiture of funds deposited with Wall Street Equities, Inc." ESI dismissed its own collection action and joined in the United States forfeiture action. ESI and the United States then agreed to a settlement in which $1.1 million of the Rowen House and Montville accounts would be released to the government, and the remainder in the accounts would be split evenly between the United States and ESI. After the distribution and division, ESI's share totaled $656,464.30.

On February 24, 2003, Martin prepared a letter for Bruce Bragagnolo, CEO of ESI. The letter proposed the following distribution of settlement proceeds:

| Settlement Amount | $656,464.30[2] |
|---|---|
| Credits: | |
| Marshal's fees | $32,823.22 |
| Van Remort[e]l's/Conway & Conway's Attorney's fees (includes costs of $4,568.78) | $109,317.30 |
| Polliakoff, Fla. Attorney Fees | $21,605.24 |
| Martin, Outstanding Attorney's Fees (Includes $50,000 discount off $118,959.00 outstanding balance) | $68,959.80 |
| Contingency Fee (45%) | $295,409.00 |
| Kurt Van Voorhies | |
| Al Saker | $25,000.00 |
| Subtotal of Credits | $565,714.56 |
| Net to ESI | $90,749.74 |

cept 40% of his fees in ESI stock. In January 2001, Martin ceased accepting payment in ESI's stock because the Securities and Exchange Commission suspended public trading of ESI's stock.

2. The settlement funds were initially deposited in Van Remortel's trust account; Van Remortel withdrew his attorney's fees and the Marshal's fees prior to transferring the balance to Martin's trust account. Thus, Martin received only $577,039.50 of the settlement funds.

Martin testified that he sent the distribution letter to Bragagnolo sometime on the morning of February 25, 2003, by fax and by email.[3] The proposed disbursement would pay Martin $68,959.80 ($60,940.00 of which related to the Cannon litigation) for hourly fees incurred under the February 20, 2000, and May 3, 2002, fee agreements in addition to $295,409.00 under the December 11, 2001, contingency fee agreement. The Board found that the total attorneys' fees related to the litigation, including Florida and New York counsels, consumed over 73% of the recovery.

At some point on February 25, 2003, Martin disbursed $376,968.80 [4] to his operating account pursuant to the February 24, 2003, letter to Bragagnolo. As discussed at length *infra*, the record is not clear when these transfers were made. According to Bragagnolo's testimony, he spoke with Martin by phone on the morning of February 25, 2003, and disputed the proposed distribution with respect to Martin and Van Remortel.[5] At 10:45 a.m., Eastern Standard Time, on February 25, Bragagnolo followed up with an email[6] to Martin stating:

Further to our telephone conversation this morning this is your instruction not to pay any amounts from the settlement funds of $656,400. You are expressly not to pay Fred Van Remortel; Al Sak-

er or Kurt Van Voorhies until we have seen your letter and have given you further written instructions.

Because the Hearing Committee credited Bragagnolo's testimony on this issue, the telephone conversation, as referenced to in the e-mail, would have taken place before 10:45 a.m., the time of the email. We note, however, that the Hearing Committee made no such finding—instead, it concluded that Martin learned of the dispute "no later than February 25, 2003."

According to Martin's version of events, Bragagnolo agreed to the proposed distribution during the early morning February 25th telephone conversation after Martin gave Bragagnolo a $50,000.00 discount. As a result, when Martin saw Bragagnolo's 10:45 a.m. email at 4:37 p.m. the same day, Martin replied with an email stating:

I assume this e-mail predates our discussion this morning, and the letter that I faxed and e-mailed to you. As you know, I disbursed the funds after our discussion, including funds that I had wired to your trust account as you directed.... [7]

Bragagnolo and Martin did not correspond again until March 5, 2003, when Bragagnolo once again disputed the fee distribution. The Hearing Committee expressly did not

---

3. The record is silent as to the precise time that Martin sent the letter.

4. This sum included Martin's $68,959.80 in hourly fees, Martin's $295,409.00 contingent fee, and Kurt Van Voorhies' $12,600.00 fee.

5. The precise time of this phone conversation is unclear.

6. Bragagnolo, who was in Vancouver, Canada, sent this email at 7:45 a.m., Pacific Standard Time.

7. Bar Counsel argued in its brief and at oral argument that Martin did not actually dis-

burse any of the funds until February 27, 2003, two days after Bragagnolo registered his dispute, because checks and bank statements reflect that funds were not transferred until February 27. Martin may have deposited the checks on February 25, as he claims, and the checks were not processed by the financial institution until two days later. However, because Bar Counsel did not make this argument before the Hearing Committee or the Board, no findings of fact were made on this issue. Thus, we do not consider this argument.

credit "[Martin's] testimony that he disbursed the disputed fee amount to his operating account before he heard any objection from Bragagnolo." The Hearing Committee found that Martin did not transfer the disputed funds from his operating account into an escrow or trust account until December 2003.

Sometime after February 25, 2003, Martin called the D.C. Bar Ethics Hotline for advice on how to handle disputed fees. Martin testified that Ernest Lindberg, who answered his call, told Martin not to return the disbursed funds, which were then in Martin's operating account, into his client's trust account because "if you put those funds back in your trust accounts, you will violate the rules against co-mingling attorney funds with client funds." Lindberg testified that he had no independent recollection of a call from Martin, that he would not have provided legal advice to persons calling in on the Hotline, and that he would only have directed the caller to relevant rules and legal ethics opinions. Lindberg further testified that he would not have advised Martin to retain disputed funds in his operating account "because that seems to me that would be inconsistent with reference in [Rule] 1.15(c) that says you must put it back in accordance with [Rule] 1.15(a)." The Hearing Committee found Martin's assertion that he had received advice not to transfer disputed funds from his operating account to a trust account "incredible."

On March 27, 2003, ESI filed a petition to arbitrate the fee dispute with Martin before the D.C. Bar's Attorney–Client Arbitration Board. After denying Martin's motion to dismiss, the ACAB issued a decision awarding ESI $165,313.00, the amount above what the ACAB considered a reasonable fee. ESI filed a motion to confirm the award in Superior Court, but Martin obtained removal of the case to federal District Court for the District of Columbia where he sought to have the award vacated. On September 30, 2004, the District Court affirmed the ACAB award for $165,313.00 and an additional $10,190.48 in prejudgment interest.

On October 7, 2004, ESI filed an ethics complaint with the Board on Professional Responsibility in the District of Columbia against Martin, who had not yet paid the arbitration award. On October 13, 2004, Martin appealed the judgment of the District Court to the United States Court of Appeals for the District of Columbia Circuit after depositing a sum in the amount of the District Court's judgment with the court. On January 19, 2005, ESI and Martin agreed to a settlement in which Martin would dismiss his appeal and would give ESI $87,820.50, half the District Court's judgment plus interest. In return, the settlement stated that "ESI and Bragagnolo shall cause to be submitted to Bar Counsel a letter dismissing the Bar Complaint and requesting that Bar Counsel terminate its investigation of Martin without action."

On June 29, 2004, before ESI filed its ethics complaint, Martin filed a Virginia bar application in which he stated, "I am currently involved in a fee dispute with a former client [ESI]," and that "[o]nce I received notice of the dispute, I placed the disputed funds into a separate interest bearing account, to be available in the event I am ultimately found liable on the claim." In fact, contrary to what he asserted in the Virginia bar application, Martin had not promptly placed the disputed funds in a separate interest-bearing account; the Hearing Committee found that Martin knew of the dispute no later than February 25, 2003, but did not deposit the funds in a separate account until December 2003. In his testimony before the Hearing Committee, Martin did not ex-

plain why he made a contrary representation regarding the timing of the movement of funds in his Virginia bar application.

After ESI requested that the ethics complaint against Martin be dismissed in accordance with the ACAB award settlement agreement on January 19, 2005, Martin amended his Virginia bar application to report that an ethics complaint had been filed against him in the District of Columbia, but that "the client has requested that the Complaint be withdrawn." Martin did not explain that ESI's withdrawal request had been made pursuant to a settlement agreement. The Hearing Committee found that Martin's actions on his Virginia bar application "reflect guilty knowledge that he had improperly handled the disputed fees."

## II.

■■■ "[T]he hearing committee conducts the hearings and makes factual findings and recommendations which it submits to the Board for review." *In re Temple,* 629 A.2d 1203, 1208 (D.C.1993). "[T]he Board has the power to make its own factual findings and forward them to the court with a recommendation" but "[t]he Board must accept the hearing committee's factual findings if they are supported by substantial evidence on the record as a whole." *Id.* The Board, however, "owes no deference to the hearing committee's determination of 'ultimate facts,' which are really conclusions of law." *In re Micheel,* 610 A.2d 231, 234 (D.C.1992). "Ultimate facts" are those that have "a clear 'legal consequence.'" *See id.* at 235.

■■ This court "must accept the Board's findings of fact 'unless they are unsupported by substantial evidence of record.'" *In re Pierson,* 690 A.2d 941, 946 (D.C.1997). Like the Board, however, we review questions of law and ultimate facts

*de novo. In re Anderson,* 778 A.2d 330, 339 n. 5 (D.C.2001).

## A.

■■ We will consider first Bar Counsel's charge that Martin collected an unreasonable fee in violation of D.C. Rule of Professional Conduct 1.5(a). The Hearing Committee held that Martin had not violated Rule 1.5(a) because it found that the Florida litigation, the New York collection action, and the United States forfeiture action were separate matters. As a result, Martin was allowed to collect his hourly fees under the February 20, 2000, fee agreement for the Florida litigation; his 45% contingency fee under the December 11, 2001, fee agreement for the collection action; and his hourly fees under the May 3, 2002, fee agreement for the United States forfeiture action. The Board disagreed, finding that the Florida litigation, New York collection action, and United States forfeiture action were but a single matter that was subject to the requirement that he charge a single reasonable fee. Bar Counsel's charge thus presents us with two questions: (1) whether Martin represented ESI in a single or multiple matters, and (2) if Martin represented ESI in a single matter, whether the fee charged was reasonable.

### i.

We begin by noting that whether Martin represented ESI in a single or multiple matters is an issue of "ultimate fact" with "a clear 'legal consequence'" in determining whether the fee charged was reasonable. *In re Micheel,* 610 A.2d at 234–35. The Board, in its report, appeared confused about whether this issue should be treated as a question of law or a question of fact; on one hand, the Board discussed this issue under the heading "Conclusions of Law," but on the other hand, the Board

concluded that the Hearing Committee's findings on this point were "not supported by substantial record evidence." Neither Bar Counsel nor Martin directly address the appropriate standard of review, although Martin appears to treat this as a question of fact by applying the "clearly erroneous" standard. Because we conclude that whether Martin represented ESI in a single or multiple matters is a question of "ultimate fact," the Board owed no deference to the Hearing Committee's determination on this issue.

Martin argues that he represented ESI in separate matters because the forfeiture action was "a new case, separate and distinct from the Florida action against Mr. Cannon and the follow-on New York collection action" and "involved different parties, different facts, and different legal issues." His insistence that the forfeiture action was an entirely separate matter suffers from a serious flaw. The December 11, 2001, contingency fee agreement applied only to "[ESI's] litigation against Herbert Cannon." Under the terms of the contingency fee agreement, if the United States forfeiture action was an entirely separate matter, as he insists, Martin should not have been permitted to collect a 45% contingency fee for the litigation against Cannon from the results of the forfeiture action.

 We agree with the Board that the litigation action against Cannon in Florida, the subsequent action to collect on the Florida judgment in New York, and the United States forfeiture action were a single matter. " '[A]s a matter of common sense' a contingency fee agreement 'cannot be read to exclude collection of the settlement proceeds.' " *Dardovitch v. Haltzman,* 190 F.3d 125, 142 (3d Cir.1999). "[W]here the record reveals that the parties had no reason to believe that collection would require more than minimal effort, attorneys

have been permitted no additional fee for collection actions." *Id.* "[A]bsent some significant evidence that the collection efforts were not within the contemplation of the parties at the time they entered into the contingent fee agreement, no additional fees will be permitted." *Id.*

Here, pursuant to the December 11, 2001, fee agreement, Martin represented ESI in the Florida litigation for a 45% contingency fee. In the subsequent settlement agreement between Cannon and ESI, ESI was awarded $2.2 million but could collect the judgment only from Rowen House and Montville brokerage accounts in New York. The record indicates that neither ESI nor Martin contemplated that the collection of the judgment in New York "would require more than minimal effort." *Id.* Thus, the Florida litigation against Cannon and the collection action in New York were a single matter.

In the course of the collection proceeding, however, Martin learned that the United States had filed a civil forfeiture action against the Rowen House and Montville brokerage accounts, meaning "the federal government and ESI each sought payment or satisfaction of its judgment against Cannon from the same funds." Although the United States forfeiture action may have been unexpected, an attorney may "protect himself, and provide for attorney's fees in the event additional collection efforts are necessary . . . [by] do[ing] so explicitly in the retainer agreement. . . . [T]his is the common-sense understanding of contingent-fee agreements." *Id.* at 143. Contingency fee arrangements are, after all, arrangements by which attorney and client agree to share a degree of risk. The attorney takes the risk that little or no recovery may result from a considerable amount of work; the client takes the risk that a significant award may be given for a very small amount of work by the attor-

ney. An attorney cannot change this balance of risks later when the chances of recovery appear slim, or the amount of work required unexpectedly increases, without express provision that the client may later be responsible for additional fees, making the client aware that the attorney will assume only a limited degree of risk. Martin's December 11, 2001, fee agreement makes no provision for additional fees beyond the 45% contingency fee, and any ambiguity in the agreement would be interpreted against Martin, who drafted the agreement. *See Capital City Mortg. Corp. v. Habana Vill. Art & Folklore, Inc.*, 747 A.2d 564, 567 (D.C.2000) (stating that ambiguities in contracts will be " 'construed strongly against the drafter.' ").

### ii.

■ Having determined that the various actions were a single matter, we agree with the Board that the charged fee was unreasonable. Rule 1.5(a) states, "A lawyer's fee shall be reasonable."[8] In this case, Martin initially represented ESI for an hourly fee in accordance with the February 20, 2000, fee agreement under which he billed $13,115.00 for the Cannon litigation. On December 11, 2001, ESI agreed to a new fee agreement granting Martin a 45% contingency fee in the Florida litigation. Martin gave no credit or refund for $13,115.00 already earned under the February 20, 2000, fee agreement. Shortly after ESI joined the United States forfeiture action in New York, ESI agreed to another hourly fee agreement on May 3, 2002, under which Martin billed $47,825.00. ESI settled with the United States and received $656,464.30. Martin then sought to collect from this award $68,959.80 in hourly fees under the February 20, 2000, and May 3, 2002, fee agreements as well as $295,409.00 for the December 11, 2001 contingency fee, which totaled $364,368.80. The Board, which reviewed Martin's billings for his hourly fees, determined that $356,349.00 of the total fee directly related to the Cannon litigation, which amounted to 54% of the total award to ESI.[9]

■ We agree with the Board that, under these circumstances, Martin's total fee was unreasonable in violation of Rule 1.5(a). Generally, an attorney should not acquire "a greater interest in the outcome of the litigation than his clients." *See Attorney Grievance Comm'n of Maryland v. Korotki*, 318 Md. 646, 569 A.2d 1224, 1233 (1990) ("Without passing upon whether there can ever be circumstances justifying a contingent fee in excess of fifty percent, it is generally a violation of the rule for the attorney's stake in the result to exceed the client's stake."). *See also United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1047 (6th Cir.1994) (stating that "rules of ethics

---

8. Under Rule 1.5(a), "[t]he factors to be considered in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and the results obtained;

(5) The limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) Whether the fee is fixed or contingent.

9. The Board determined that only $60,940.00 of the $68,959.80 in hourly fees charged related to the Cannon litigation.

adopted by the legal profession" would prohibit "contracting with a client for a 75% contingency fee"); *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1278 (8th Cir. 1980) (limiting contingency fee to 45% as the "outer bound[ ] of reasonableness"); *Feingold v. Pucello*, 439 Pa.Super. 509, 654 A.2d 1093, 1094 (1995) ("Feingold's proposed contingency fee of 50% of recovery, after costs, is breathtakingly high."). " '[T]he fact that the client agreed to the [amount of the fee] does not relieve the attorney from the burden of showing that the amount agreed upon was fair and reasonable.' " *Korotki*, 569 A.2d at 1234. The combination of Martin's contingency fee and the hourly fees gave Martin well over a 50% interest in the outcome of the Cannon litigation in violation of Rule 1.5(a).

Martin argues, however, that the overall fee was nevertheless reasonable because he gave ESI a $50,000.00 discount, which the Board failed to take into account. According to Martin's February 24, 2003, letter of proposed distribution, Martin originally charged ESI $118,959.00 in hourly fees, but reduced that amount to $68,959.00 after a $50,000.00 discount. The Board used the discounted $68,959.00 figure in its report and concluded that only $60,940.00 of the fees related to the Cannon litigation. Although the Board used the discounted figure, Martin faults the Board for failing to apply the $50,000.00 discount solely to the fees he charged in relation to the Cannon litigation because he testified that the discount was intended to "give back" the fee he earned under the May 3, 2002, forfeiture action fee agree-

ment, which amounted to $47,825.00.[10] According to Martin, therefore, he charged only $10,940.00 ($60,940.00–$50,000.00) in hourly fees related to the Cannon litigation in addition to the 45% contingency fee, which amounted to approximately 47% of the total award to ESI.

Courts in other jurisdictions have noted that, "if at the conclusion of a lawyer's services it appears that a fee, which seemed reasonable when agreed upon, has become excessive ... [the attorney] must reduce the fee." *Matter of Swartz*, 141 Ariz. 266, 686 P.2d 1236, 1243 (1984) (en banc). *See also Korotki*, 569 A.2d at 1233 (citing *Matter of Swartz*, 141 Ariz. 266, 686 P.2d 1236 (1984)). Assuming, without deciding, that an *ex post facto* discount or reduction in fee can make a fee reasonable under Rule 1.5(a), Martin's discount was insufficient to bring the fee into the realm of reasonableness.[11] Even with a $50,000.00 discount, Martin charged ESI 47% of its total award from the Florida litigation, "a fee which exceeds the outer limits of reasonableness." *International Travel Arrangers, Inc.*, 623 F.2d at 1278 (reducing attorney's fees from 47% of total award to 45%).

The reasonableness of Martin's fee "must [also] be considered in light of the fact [that] other attorneys' fees were also being paid by [ESI] to [Florida and New York Counsel] for [their] involvement in the case." *Id.* The spirit of this principle is found in Rule 1.5(e), which states, *inter alia*, that "[a] division of a fee between lawyers who are not in the same firm may be made only if ... [t]he total fee is

10. The Hearing Committee found that Martin gave a $50,000.00 discount, but did not make a credibility determination regarding whether the discount was solely intended to offset fees earned in the Cannon litigation.

11. The D.C. Rule of Professional Conduct 1.5(a) states only that "[a] lawyer's fee shall be reasonable." The ABA Model Rule of Professional Conduct 1.5(a) states, in contrast, that "[a] lawyer shall not *make an agreement for, charge* or collect an unreasonable fee...." (emphasis added).

reasonable." [12] In *International Travel Arrangers, Inc.*, a client hired two attorneys for involvement in the same case. 623 F.2d at 1278. Although the fee charged by each attorney was reasonable, when combined, the fees amounted to "47% of the substantial total award" which the United States Court of Appeals for the Eighth Circuit found "disturbing." *Id.* The court accordingly reduced the total attorneys' fees. *Id.* In the case before us, Martin's individual fee was not reasonable, but even if it were, the fee unquestionably became unreasonable when taking into account the fees charged by Florida and New York counsel. Even applying Martin's discount solely to the fees incurred in the Cannon litigation, the combined attorneys' fees amounted to 67% of the total award to ESI, which is not only disturbing but borders on the unconscionable.

The unreasonableness of Martin's fee is aggravated by the relatively small amount of work he performed. The Board correctly observed that evidence in the record indicates that "Florida and New York counsel performed much of the legal work," and the Hearing Committee found that Martin "rarely spent more than 5–15 hours per week working on ESI litigation matters." Despite the relatively small amount of work performed by Martin, he charged ESI more than twice as much as the combined fees of Florida and New York counsel. For all these reasons, we agree with the Board that Martin's fee was unreasonable in violation of Rule 1.5(a).

**B.**

 Bar Counsel's second charge is that Martin violated Rules 1.15(a) and (c)

by comingling the disputed portion of ESI's settlement award with his own funds by transferring the amount designated as his fee to his operating account. Rule 1.15(a) states, *inter alia*, that "[a] lawyer shall hold property of clients ... that is in the lawyer's possession in connection with a representation separate from the lawyer's own property." Rule 1.15(c) [13] stated, *inter alia*, that "[w]hen in the course of representation a lawyer is in possession of property in which interests are claimed by the lawyer and another person ... the property shall be kept separate by the lawyer until there is an accounting and severance of interests in the property. ... Any funds in dispute shall be deposited in a separate account meeting the requirements of paragraph (a)," *i.e.*, an escrow or trust account, not the lawyer's operating account.

The Hearing Committee determined that Martin violated Rules 1.15(a) and (c) because Martin knew of a fee dispute "no later than February 25, 2003" and distributed the funds that same day despite his client's instruction not to distribute the bulk of the settlement funds. The Hearing Committee found, alternatively, that even if Martin was unaware of the dispute when he disbursed the funds, he "should have returned the funds from his operating account back to his trust account." The Board disagreed because the Hearing Committee found only that Martin was aware of a fee dispute "no later than February 25, 2003," which is the same day that the funds were disbursed, but "did not

---

**12.** The Board held that Rule 1.5(e) did not apply to the facts of this case because Martin, New York counsel, and Florida counsel were not dividing a single fee. New York counsel, for example was retained under a separate agreement. We agree with the Board that the principle of reasonableness in Rule 1.5(e) nev-

ertheless "informs the situation here where Respondent arranged for the retention of other lawyers to assist in the matter and his compensation was not based on his efforts."

**13.** Now Rule 1.15(d).

specify when on that critical day." The Board also disagreed with the Hearing Committee's alternative finding that Martin was required to return funds when a dispute occurred after distribution.

### i.

We hold that substantial evidence supported the Hearing Committee's finding that Martin was aware of a dispute prior to disbursing ESI's settlement award. Bragagnolo testified that he had a phone call with Martin instructing him not to distribute the settlement award, and that he later placed this objection in an email sent to Martin at 10:45 a.m., Eastern Standard Time, on February 25, 2003. Martin testified that he had two phone calls with Bragagnolo, one on February 24, 2003, and a second the next morning on February 25, 2003, in which Bragagnolo agreed to the distribution of funds. Martin testified that he did not see Bragagnolo's 10:45 a.m. email until *after he had already distributed the funds.* Thus, at 4:37 p.m. that same day, Martin replied to Bragagnolo's email that "I disbursed the funds after our [telephone] discussion." The Hearing Committee, based upon "the witnesses' testimony and demeanor," credited Bragagnolo's testimony about his phone call and emails over Martin's testimony and found that Martin was aware of a dispute prior to the disbursement of funds.

The Board faulted the Hearing Committee's findings on these points because "[t]he Committee did not make a finding whether Respondent was aware of a dispute with Bragagnolo *before* making the fee disbursement" and found only that Martin learned of a dispute "no later than February 25, 2003," the day on which the funds were disbursed. We think the Board reads the Hearing Committee's report too narrowly. The report makes clear, in context, that the Hearing Committee credited Bragagnolo's testimony

that he informed Martin of a dispute by phone on the morning of February 25, 2003, and Martin does not deny that the disbursement of funds occurred only after the phone conversation with Bragagnolo; Martin's 4:37 p.m. email acknowledges that "I disbursed the funds *after* our [telephone] discussion." The Hearing Committee's finding that Martin knew of a dispute prior to disbursal is made clearer when the Committee states, *"Even if we credit Respondent's testimony that he disbursed the disputed fee amount ... before he heard any objection from Bragagnolo,* the record evidence makes it clear that Respondent knew of the dispute later that same day." We conclude that the Hearing Committee found that Martin knew of a dispute prior to the disbursement of funds, and that this finding was supported by substantial evidence.

Martin violated Rules 1.15(a) and (c) by distributing funds that were in dispute. "There is no requirement that the dispute be 'genuine,' 'serious,' or 'bona fide.'" *In re Haar,* 667 A.2d 1350, 1353 (D.C.1995). Once the fact of dispute has been conveyed, disputed funds must be placed in a separate interest-bearing account. D.C. Rule of Professional Conduct 1.15(c). Comingling the disputed funds with attorney funds will result in a violation of Rules 1.15(a) and (c). *See In re Berryman,* 764 A.2d 760, 764, 767 (D.C.2000). Martin did not place the disputed funds into a separate account until December 2003, some nine months after he was aware of a dispute. As a result, Martin comingled disputed funds with his own funds in violation of Rules 1.15(a) and (c).

### ii.

We also agree with the Hearing Committee's alternative holding that even if Martin was unaware of a fee dispute when the settlement funds were disbursed, he

violated Rules 1.15(a) and (c) by failing to restore disputed funds to a separate trust account after becoming aware of a dispute. We conclude, however, that we should not apply that ruling to Martin because of the uncertainty surrounding the scope of these rules at the time of the events described. Few authorities address whether an attorney is required to return funds to a separate account when a fee dispute is conveyed only after the disbursal of funds.[14] Rule 1.15(c) states, "Any funds in dispute shall be deposited in a separate account," but neither the rule nor the comments specify whether funds must be restored to a separate account if the dispute arises after funds have already been disbursed. Under the circumstances presented here, however, we think the funds should be restored to a separate account.

The Hearing Committee found that even if Martin did not know of a dispute when he disbursed the funds, "he knew of the dispute later that same day." Given the short passage of time, Martin could have easily reversed the transfer of funds and returned the amount in dispute to a trust account. Indeed, according to the bank stamps on the checks and bank statements, the funds were not actually transferred by the financial institution until February 27, 2003, two days after Martin was aware of a dispute.[15]

We are also unconvinced by the Board's reasoning that, once disbursed, funds can "no longer [be] client or protected funds." If disbursing funds from a client trust account automatically removed funds from the protection of Rule 1.15, an attorney could easily circumvent the protections afforded by this rule by disbursing putatively earned fees without ever providing clients an opportunity to dispute the fee. For example, in this case, Van Remortel, ESI's New York counsel, received the settlement award, withdrew his fees, and then transferred the remainder to Martin for disbursal. Under the Board's view of Rule 1.15, the funds taken by Van Remortel,

---

**14.** The following authorities hold the funds must be returned: *In Matter of Berg*, 1997 WL 469003, *9 (Rev. Dep't of Ca. State Bar 1997) (although attorney testified he was not aware of a dispute when he withdrew funds, "respondent failed to provide any evidence of a return to trust of the disputed portion of the fees."); Vermont Legal Ethics Opinion 1998–05 ("Should the client dispute the transfer, the immediate re-deposit of funds into the trust account placed the lawyer or law firm in compliance with the Rule.").

The following authorities hold that funds need not be returned: *Board of Prof'l Responsibility v. Curry*, 266 S.W.3d 379, 392 (Tenn. 2008) (Because no fee dispute existed when attorney withdrew funds, "he was not obligated to return them after a dispute subsequently arose."); Oregon Legal Ethics Opinion 2005–145 ("Because Oregon RPC 1.15–1 does not expressly mandate replenishment after Lawyer has withdrawn funds without knowledge of a dispute, we conclude that replenishment is not required."); Colorado Legal Ethics Opinion 118 ("[T]he Committee does not believe that a lawyer should be required or permitted to return a disputed amount to a trust account of the lawyer that holds funds of any client, if the client does not dispute the lawyer's fee before the lawyer withdrew funds for payment from the lawyer's trust account...."); California Legal Ethics Opinion 2006–171 ("Funds properly withdrawn from a [trust account] under rule 4–100(A)(2) and later disputed by the client ... do not need to be re-deposited into the attorney's [trust account].").

**15.** As discussed *supra* note 7, Bar Counsel argues Martin did not deposit the checks until February 27, 2003. As we stated, the Hearing Committee and Board never found whether Martin deposited the checks on that date or whether the checks were deposited on February 25 and were not processed by the bank until two days later. Here, we note only that the financial institution did not process the fund transfer until two days later, which meant Martin could have simply told the financial institution to cancel his checks or otherwise stop the transfer.

which ESI had no opportunity to dispute, would not be protected by Rule 1.15. We cannot accept an interpretation of the rule that would so easily allow an attorney to circumvent its protections.

The protections afforded by Rule 1.15 to a client's interest in disputed funds should not be underestimated. As we stated in *In re Hessler,* a case involving misappropriation and comingling, "placing a client's funds in the attorney's own account ... puts the client's funds at risk." 549 A.2d 700, 701–02 (D.C.1988). "[I]nherently there is danger in such practice for frequently unforeseen circumstances arise jeopardizing the safety of the client's funds." *Id.* at 702. "By mingling client funds with the attorney's own, the client's funds become more difficult to trace and are subject to the risk that they may be taken by creditors of the attorney." *Id.* The inherent harm in comingling funds does not require moral turpitude for, "as far as the client is concerned[,] the result is the same whether his money is deliberately misappropriated by an attorney or is unintentionally lost by circumstances beyond the control of the attorney." *Id.*

> So serious has been the prohibition against commingling that it has been held that a fiduciary who does so becomes an absolute guarantor of the funds on deposit, so that if, for example, the bank fails, the fiduciary is responsible. This sanction, plainly a penalty to prevent commingling, moreover has survived the relaxation of the old "earmarking" rule which imposed a similar penalty if a fiduciary failed to label trust assets as such.

*Id.* (footnote omitted). Although *In re Hessler* discusses funds that clearly belong to the client, the same dangers are present with respect to comingling disputed funds because subsequent litigation may determine that at least a portion of the disputed funds belongs to the client. Moreover, the protections against comingling in Rule 1.15 extend to both client funds and disputed funds.

For these reasons, we hold that if a client in any future matter, with reasonable promptness, disputes an attorney's fee after the attorney has already withdrawn his fee from the client trust account, the attorney must place the disputed amount in a separate account in accordance with Rule 1.15(a). What is "reasonable promptness" will be a case-specific inquiry, and we need not address other circumstances in which a client is less diligent in reviewing and disputing an attorney's fee. Going forward, an attorney who, like Martin, claims he learned of a dispute "later that same day" in circumstances such as these will be required to return the disputed funds to a separate account under Rules 1.15(a) and (c).

### C.

Bar Counsel's third charge is that Martin violated Rule 1.16(d) by failing to promptly return unearned fees. Rule 1.16(d) states, in relevant part: "In connection with any termination of representation, a lawyer shall ... surrender[ ] papers and property to which the client is entitled." Bar Counsel alleges that Martin violated this rule by challenging ESI's ACAB arbitration award in federal District Court and appealing to the District of Columbia Circuit, "effectively den[ying] his client the benefits of D.C. Bar Rule XIII ... [and] driving his cash-poor client to 'cut its losses and settle for 50% of what the ACAB ... had ruled [ESI] was entitled to receive.'" The Hearing Committee agreed with Bar Counsel, characterizing Martin's actions as "resisting the [arbitration] process and then taking fruitless appeals over the course of one year following the ACAB award," which denied ESI

property it was entitled to receive under Rule 1.16(d). The Board disagreed with the Hearing Committee, holding that Martin "had the right to contest the fee arbitration and seek appeal prior to the requirement to make the payment."

District of Columbia Bar Rule XIII states that "[a]n attorney subject to the disciplinary jurisdiction of this Court shall be deemed to have agreed to arbitrate disputes over fees for legal services" and that such arbitration "shall be final and binding on the parties according to applicable law[.]" The purpose of Rule XIII " 'is to provide a relatively quick, efficient and informal means of private dispute settlement.' " *See Schwartz v. Chow*, 867 A.2d 230, 233 (D.C.2005) (per curiam) (citing *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214 (2d Cir.1972)). Rule XIII arbitrations are also intended to be essentially final, as indicated by this court's relatively narrow scope of review. *See id. See also* D.C.Code § 16–4423 (2001) (setting forth the grounds for vacating an arbitral award).[16] If the ACAB issues an award in favor of the client in a fee dispute, the attorney is required to give this sum to the client under Rule 1.16(d), which requires "a lawyer to make timely return to the client of any property or money 'to which the client is entitled.' " Rule 1.16 Comment [11].

Recognizing that whether a violation occurred in this case is a close question, we agree with Bar Counsel and the Hearing Committee that Martin violated Rule 1.16(d) under the circumstances presented here. Martin violated Rule 1.16(d) by repeatedly resisting the mandatory arbitration process and "taking fruitless appeals" with claims that were not substantial following the ACAB decision. We do not lightly dismiss the Board's position that Martin had a right to contest the outcome of the arbitration. Nevertheless, as we explain in recounting the procedural history that follows, Martin "litigated the arbitration award to the death" and his continued failure to return unearned fees to ESI "allow[ed] Respondent to profit from his wrongdoing at his client's expense."

On March 27, 2003, ESI filed a petition to arbitrate its fee dispute with Martin before the ACAB. On May 21, 2003, Martin filed a motion to dismiss the arbitration. Martin argued that ESI's petition implicated funds paid to other attorneys (New York counsel); that New York counsel was an indispensible party; that the claim was barred by the statute of limitations because his fee agreement with ESI began in 2000; and that he intended to claim that ESI had committed fraud, which was not a defense suited for an arbitration proceeding.

16. D.C.Code § 16–4423 allows an arbitration award to be vacated if:

(1) The award was procured by corruption, fraud, or other undue means;

(2) There was:

(A) Evident partiality by an arbitrator appointed as a neutral arbitrator;

(B) Corruption by an arbitrator; or

(C) Misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;

(3) An arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to § 16–4415, so as to prejudice substantially the rights of a party to the arbitration proceeding;

(4) An arbitrator exceeded the arbitrator's powers;

(5) There was no agreement to arbitrate; or

(6) The arbitration was conducted without proper notice of the initiation of an arbitration as required in § 16–4409 so as to prejudice substantially the rights of a party to the arbitration proceeding.

An arbitration award may also be vacated "on other reasonable ground." *Id.*

On June 24, 2003, ESI responded to Martin's motion to dismiss. Addressing Martin's first two arguments, ESI clarified that it sought to recover only the fees received by Martin and not by New York counsel. Second, ESI stated that the claim was well within the statute of limitations; Martin did not distribute the settlement award—which led to the fee dispute—until February, 2003, and ESI filed its petition to arbitrate one month later in March 2003. Needless to say, the claim was well within the three-year statute of limitation. D.C.Code § 12–301(7) (2001). Finally, ESI argued that Martin's fraud claim was "spurious," but even if colorable, it was fully arbitrable. In any event, Martin's fraud claim was later exposed as baseless. Martin alleged that ESI fraudulently induced him to accept 40% of his legal fees in worthless ESI stock. However, in his testimony before the Hearing Committee, Martin admitted that he did not believe nor claim that ESI had defrauded him until ESI instituted the arbitration proceedings three years after he accepted part of his fee in ESI stock.

Following ESI's response to Martin's motion to dismiss, Martin filed a second motion to dismiss on July 10, 2003. The motion restated his arguments that ESI's claim implicated indispensible third parties, that the statute of limitations applied, and that the ACAB could not arbitrate the fraud claim. On July 31, 2003, the ACAB denied Martin's motion to dismiss and reminded him that a hearing had been scheduled for September 16, 2003.

Not content with the ACAB's ruling on his motion to dismiss, Martin filed a complaint in Superior Court to enjoin the ACAB proceeding on September 10, 2003. On September 12, 2003, the Superior Court denied Martin's request to enjoin the ACAB proceedings. Later that same day, September 12, Martin requested that the ACAB hearing be postponed because ESI's claim allegedly engendered confusion by referencing fees paid to New York counsel. However, as ESI stated in response and as recounted above, "[t]he matter of the N.Y. counsel fees ha[d] already been considered and decided by the [ACAB] Panel." The ACAB denied the motion to postpone that same day. Despite Martin's alleged confusion about ESI's claim, Martin successfully filed an answer and counterclaims three days later on September 15, 2003.

On September 23, 2003, the ACAB came to a decision and awarded ESI $165,313.00. For nearly a month following the decision, however, Martin made no effort to pay the award. ESI sought to confirm the arbitration award in Superior Court on October 10, 2003. In addition, on October 15, 2003, the ACAB ordered Martin to pay the award within ten days. Martin did not pay the award as ordered. Rather, fifteen days later, on October 30, 2003, Martin obtained removal of ESI's motion to confirm the arbitration award from Superior Court to the Federal District Court for the District of Columbia.

On December 5, 2003, Martin filed an answer and a counterclaim seeking to vacate the ACAB award to ESI in federal District Court. In his answer, Martin argued that the award should be vacated on the grounds that "D.C. Bar Rule XIII is *ultra vires*," that "D.C. Bar Rule XIII is unconstitutional," that ACAB lacked jurisdiction because "[n]one of the requirements under D.C. Bar Rule XIII for deemed consent to arbitrate exist," and that "[t]he arbitrators were guilty of misconduct in refusing to postpone the hearing" and refusing to receive evidence regarding Martin's admittedly untimely counterclaims. Martin's counterclaim restated his argument that ESI had commit-

ted fraud by paying him in worthless ESI stock.[17]

On September 30, 2004, the federal District Court dismissed Martin's *ultra vires* and jurisdiction arguments because he failed to raise them before the ACAB and rejected Martin's constitutional argument because "mandatory client fee arbitration is nothing new." The District Court found the ACAB arbitrators did not commit misconduct by refusing to postpone the hearing because Martin was able to respond to ESI's claims within three days of the denial to postpone. Finally, citing a decision from this court,[18] the District Court dismissed Martin's counterclaims because "[c]ounterclaims will not lie in proceedings to confirm arbitration awards."

On October 13, 2004—more than nineteen months after ESI petitioned for arbitration before the ACAB—Martin filed an appeal to the United States Court of Appeals for the District of Columbia Circuit. Contemporaneously, an ESI shareholder by the name of Ron Grow, at Martin's behest, filed a petition in Nevada state court to force ESI to hold a shareholders' meeting, thus expanding the scale of litigation with which ESI had to contend.[19] The Hearing Committee found that, under the pressure of the lengthy above-stated procedural history, Martin "dr[ove] his cash-poor client to 'cut its losses and settle for 50% of what the ACAB ... had ruled [ESI] was entitled to receive.'"

This procedural history convinces us that the Hearing Committee was correct when it concluded that Martin "resist[ed] the process and then [took] fruitless appeals over the course of one year" to defeat the purpose of Rule XIII.[20] Martin's resistance to every step of the arbitration process is quite evident; he filed two motions to dismiss before the ACAB, then sought to enjoin the proceedings in Superior Court, and then sought postponement when he could not enjoin the proceedings. Even after the ACAB decision, Martin sought to vacate the award in federal District Court and then appealed to the Court of Appeals when his claims failed again. Contemporaneously, Martin instigated new litigation against ESI in Nevada to further exhaust ESI's resources. In addition, the bases for Martin's challenge to the ACAB proceedings and ultimately to the ACAB award were not substantial. We fully recognize the right of an attorney to challenge an ACAB award according to applicable law. Here, however, Martin's numerous filings before the ACAB, two state courts, and two federal courts as well as the consistently poor quality of his claims convinces us that Martin was engaged in noth-

---

17. As indicated *supra* note 16, the ground for vacating an arbitration award are quite narrow, and most of Martin's claims did not fall within the permissible categories to vacate an arbitration award.

18. *A.S. Johnson Co. v. Atlantic Masonry Co.*, 693 A.2d 1117, 1120–21 (D.C.1997) (complaint to stay arbitration was not a "pleading" requiring counterclaims from the same transaction to be included).

19. ESI claimed that Martin was attempting to circumvent the ACAB award by orchestrating a takeover of ESI and then causing the company to forgive any money owed by Martin to ESI. The Hearing Committee did not make any findings with respect to this allegation, and the Board found that the evidence was insufficient to support Bar Counsel's claim. Nevertheless, the Hearing Committee did find that the Nevada lawsuit was instituted at Martin's behest, and we refer to this lawsuit only to show that Martin was expanding the field of litigation and exhausting ESI's resources.

20. Like the Hearing Committee, we conclude that the absence of a Fed. R. Civ. Proc. Rule 11(c) sanction against Martin does not absolve him of his conduct. The record does not indicate whether any Rule 11 sanctions had been requested.

ing more than an effort to exhaust his former client's resources and compel it to settle for half of what it deserved. For these reasons, we are satisfied that Martin violated Rule 1.16(d) by unreasonably withholding the arbitral award to which ESI was entitled.

#### D.

■■■ Bar Counsel's fourth charge was that Martin violated Rule 8.4(c) by engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation." We have stated that Rule 8.4(c) should "not be accorded a hyper-technical or unduly restrictive construction" and that "dishonesty encompasses conduct evincing a lack of honesty, probity, or integrity in principle; a lack of straightforwardness." *In re Ukwu,* 926 A.2d 1106, 1113 (D.C.2007) (brackets and internal quotation marks omitted). The Hearing Committee found Martin violated Rule 8.4(c) by falsely claiming that Ernest Lindberg advised him not to place the disputed fees back into a separate trust account.[21] The Board held that substantial evidence supported the Hearing Committee's finding.

Martin argues that the Hearing Committee's credibility determination that Martin gave a false statement in connection to the advice he received from Lindberg should be given no deference. We do not give deference to a Hearing Committee's credibility determination where that determination is predicated upon a conclusion of law rather than the demeanor of

testifying witnesses. *In re Anderson,* 778 A.2d 330, 341–42 (D.C.2001). Martin argues that the Hearing Committee rested its credibility determination of Martin and Lindberg's testimony on the legal conclusion that the advice Lindberg allegedly gave was incorrect, and that Martin was not required under the Rules of Professional Conduct to restore the disputed fees to a separate trust account.

We are unpersuaded that the Hearing Committee's credibility determination should be given no deference. First, the Hearing Committee credited Lindberg's testimony that he never gave legal advice to attorneys calling the D.C. Bar Ethics Hotline but merely directed attorneys to relevant rules and opinions. This determination was not predicated upon a legal conclusion. Second, the Hearing Committee also credited Lindberg's testimony that, even if he had given legal advice, he would never have provided the advice alleged by Martin "because that advice was incorrect." Martin argues this second finding rested upon an incorrect legal conclusion because the Rules of Professional Conduct did not require him to return the disputed funds to a separate trust account.[22] What is important in the credibility determination here, however, is not whether the purported advice was in fact legally sound but whether Lindberg thought the advice was correct. Lindberg testified that the advice Martin allegedly received "seems *to me* " inconsistent with Rule 1.15. Martin's testimony was found to be "incredible" by the Hearing Commit-

---

**21.** The Hearing Committee also found that Martin violated Rule 8.4(c) by falsely stating on his Virginia bar application that he had promptly placed the disputed funds into a separate interest-bearing account. The Board agreed with the Hearing Committee but considered Martin's false statements on the Virginia bar application only as an aggravating factor in sanctions because Bar Counsel did not claim a violation of Rule 8.4(c) based upon the Virginia bar application statements

in the specification of charges. We agree with the Board's conclusion on this point.

**22.** Martin's argument, of course, is based on the same argument which we rejected, *supra,* in II.B.ii where we held that Martin was required to transfer the disputed funds to a separate trust account in accordance with Rules 1.15(a) and (c).

tee because Lindberg would not have given advice he believed to be legally incorrect, regardless whether Lindberg's own belief was correct or not.

Based upon the Hearing Committee's credibility determinations, we agree with the Board that Martin violated Rule 8.4(c) by falsely claiming that he had received advice from the D.C. Bar Ethics Hotline not to return disputed funds to a separate trust account. Martin's false statements evince "a lack of honesty, probity, or integrity in principle." *In re Ukwu*, 926 A.2d at 1113 (internal quotation marks omitted). As in *In re Ukwu*, "[w]e do not suggest that every credibility finding in favor of Bar Counsel automatically establishes perjury or false testimony on the part of a respondent whose recollection was different." *Id.* at 1118 n. 23. However, the suggestion that Lindberg would have given advice he perceived to be wrong and in contravention of his general practice not to give any advice "is improbable to say the least." *Id.*[23]

### E.

■ Bar Counsel's fifth charge is that Martin violated Rule 8.4(d) by requiring

ESI to withdraw its bar complaint against Martin in the settlement following the ACAB arbitration award.[24] The settlement agreement also required ESI and Bragagnolo not to "aid, abet or cause the institution or prosecution of Suit ... arising from or relating to Enterprise Solutions Inc."

■ Rule 8.4(d) states that it is professional misconduct for a lawyer to "[e]ngage in conduct that seriously interferes with the administration of justice." In order to sustain a violation of this rule, Bar Counsel must prove that the attorney's conduct is (1) improper, (2) that the conduct bears "directly upon the judicial process ... with respect to an identifiable case or tribunal," and (3) the conduct must "taint the judicial process in more than a *de minimis* way." *In re Uchendu*, 812 A.2d 933, 940 (D.C. 2002) (internal quotation marks omitted).

It is well-settled that an attorney who enters into an agreement with a client which requires the client either to refrain from filing or to seek dismissal of a bar complaint violates Rule 8.4(d). The settlement agreement between ESI and Martin

---

**23.** In addition, statements that Martin made on his Virginia bar application make his testimony even more improbable. Although Martin testified that he had been advised not to return the disputed funds to a separate trust account, he stated on his Virginia bar application that he promptly placed the disputed fee in a separate account, implying that he fulfilled his ethical duties to avoid comingling. Martin's bar application suggests that he believed the proper action would have been to place the disputed fee in a separate account, in contradiction to the advice he claims to have received from Lindberg.

**24.** The Hearing Committee sustained a violation of this rule on the grounds that Martin failed to disclose to his client that, after the fund distribution list was challenged by the client, [Martin] allowed the disputed fees to remain in his operating account as opposed

to his trust account; resisted and delayed engaging in the process of fee arbitration with his client ...; and falsely reported to ACAB that the disputed funds were kept in a trust account and he failed to disclose to the Virginia Bar that that [sic] the disputed funds were kept in his operating account and were not kept in a trust account.

The Board sustained a violation of this rule on the grounds that Martin made "false statements to Bar Counsel that the disputed funds were held in his trust account" and that Martin required ESI "to dismiss or withdraw its disciplinary complaints filed against him with the Office of Bar Counsel." As we sustain Martin's violation of Rule 8.4(d) on the ground that he required ESI to dismiss its bar complaint against him, we do not address the other grounds raised by the Hearing Committee and the Board.

stated, "ESI and Bragagnolo shall cause to be submitted to Bar Counsel a letter dismissing the Bar Complaint and requesting that Bar Counsel terminate its investigation of Martin without action." The District of Columbia Bar's Legal Ethics Opinion 260 states that an agreement whereby "the client agrees not to file a complaint with Bar Counsel against the lawyer constitutes conduct that 'seriously interferes with the administration of justice'" in violation of Rule 8.4(d). The District of Columbia Bar's position is consistent with that of other jurisdictions. *The Florida Bar v. Frederick*, 756 So.2d 79, 86 (Fla. 2000) (per curiam) (violation of Rule 8.4(d) where attorney required clients to "agree to either not contact the Florida Bar with any complaints concerning him, or if they had already done so, that they would withdraw the same."); *Matter of Cartmel*, 676 N.E.2d 1047, 1050 (Ind.1997) (per curiam) ("By entering into an agreement with his client which called for dismissal of the grievance she had filed against him, the respondent engaged in conduct that was prejudicial to the administration of justice and thus violative of Prof. Cond. R. 8.4(d)."); *People v. Moffitt*, 801 P.2d 1197, 1198 (Colo.1990) (en banc) (attorney's "effort to condition settlement of the malpractice claim upon [client's] agreement not to file a grievance against him constituted conduct prejudicial to the administration of justice."); *In re Tartaglia*, 20 A.D.3d 81, 798 N.Y.S.2d 458, 460–61 (2005) (per curiam) (attorney "engaged in conduct prejudicial to the administration of justice" by insisting that client withdraw bar complaint). Because the settlement agreement required ESI to withdraw its bar complaint against Martin, we sustain the violation of Rule 8.4(d).

Martin argues that no violation of Rule 8.4(d) occurred because ESI's request to withdraw the bar complaint had only a *de minimis* effect upon the disciplinary proceeding. Despite ESI's request, Martin asserts, Bar Counsel's investigation proceeded and Bragagnolo testified before the Hearing Committee. Martin's argument fails to recognize that "[a]ll that Rule 8.4(d) requires is conduct that taints the process or *potentially* impact[s] upon the process to a serious and adverse degree." *In re Uchendu*, 812 A.2d at 941 (emphasis in original) (internal quotation marks omitted). *See also In re Reback*, 513 A.2d 226, 231–32 (D.C.1986) (attorneys' false signature on Superior Court filing tainted judicial process "even though their dishonesty, as such, caused the client little, if any, prejudice."). Here, the settlement agreement certainly had the potential to seriously impact the bar proceedings against Martin. Prior to giving testimony, Bragagnolo reviewed the settlement agreement and was concerned that the agreement might prohibit him from testifying in the disciplinary action. Tellingly, when Bragagnolo sought assurances from Martin that he would not retaliate for testifying, Martin refused to provide any assurance. Bragagnolo testified under subpoena. The settlement agreement therefore had the potential to prevent Bragagnolo from testifying, which would have seriously undermined Bar Counsel's case; in light of this, we cannot say that the settlement agreement had only a *de minimis* effect.

### III.

 Having established Martin's violation of Rules 1.5(a), 1.15(a) and (c), 1.16(d), 8.4(c), and 8.4(d), we turn to the appropriate sanction for this case. The Hearing Committee, which sustained Martin's violation of all counts except for charging an unreasonable fee under Rule 1.5(a), recommended a one-year suspension and payment of restitution to ESI for the remainder of the ACAB arbitration award with pre and post-judgment interest prior to

reinstatement. The Board, which sustained Martin's violation of Rules 1.5(a), 8.4(c), and 8.4(d), recommended a six-month suspension with restitution of the remainder of the ACAB arbitration award as a condition to reinstatement with pre and post-judgment interest. Bar Counsel argues for disbarment.

 "The discipline we impose should serve not only to maintain the integrity of the profession and to protect the public and the courts, but also to deter other attorneys from engaging in similar misconduct." *In re Scanio*, 919 A.2d 1137, 1144 (D.C.2007) (internal quotation marks omitted). We base our determination of sanctions upon a number of factors, such as (1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty, (4) violation of other disciplinary rules, (5) the attorney's disciplinary history, (6) whether the attorney has acknowledged his or her wrongful conduct, and (7) mitigating circumstances. *In re Elgin*, 918 A.2d 362, 376 (D.C.2007). In addition, "[s]o long as the Board's sanction recommendation falls within the wide range of acceptable outcomes, it comes to us with a strong presumption in favor of its imposition." *Id.* (internal quotation marks omitted). Nonetheless, "[i]n the final analysis, it is the court which decides the sanction to be imposed." *Id.*

Under our case law, Martin's unreasonable fee in violation of Rule 1.5(a), comingling funds in violation of Rules 1.15(a) and (c), and failure to promptly return client funds in violation of Rule 1.16(d), standing alone, do not warrant a severe penalty such as a lengthy suspension or disbarment. For example, sanctions for charging an unreasonable fee range "from informal admonition to suspension," and suspension is usually imposed only in combination with violation of other rules. *In re Shaw*, 775 A.2d 1123, 1125 n. 5 (D.C. 2001) (per curiam). *See also In re Roxborough*, 675 A.2d 950, 952 (D.C.1996) (per curiam) (noting attorney received informal admonition for charging an excessive fee). "Sanctions for the single act of commingling generally have ranged from [public] censure accompanied by a requirement for continuing legal education in professional responsibility to suspension." *In re Berryman*, 764 A.2d 760, 767 (D.C.2000) (internal citations omitted). Similarly, failure to promptly return client funds has been punished with public censure. *In re Mance*, 980 A.2d 1196, 1208 (D.C.2009) (public censure for comingling in violation of Rule 1.15(a) and failure to promptly return client funds in violation of Rule 1.16(d)).

Martin's dishonesty in violation of Rule 8.4(c) and interference with the administration of justice in violation of Rule 8.4(d), however, warrant imposition of a more severe sanction. The violation of these two rules warrants severe sanction because "honesty is 'basic' to the practice of law." *In re Mason*, 736 A.2d 1019, 1024 (D.C. 1999). The Board noted that we have generally imposed relatively short periods of suspension for isolated instances of dishonesty, *see In re Hawn*, 917 A.2d 693, 693 (D.C.2007) (per curiam) (thirty-day suspension for falsifying transcript); *In re Owens*, 806 A.2d 1230, 1231 (D.C.2002) (per curiam) (thirty-day suspension for making false statements to administrative law judge); *In re Schneider*, 553 A.2d 206, 212 (D.C.1989) (thirty-day suspension for falsifying receipts), whereas we have imposed relatively longer suspensions where dishonesty is accompanied by other serious violations or is protracted, *see In re Wright*, 885 A.2d 315, 316–17 (D.C.2005) (per curiam) (one-year suspension for pattern of dishonesty in several matters); *In re Ukwu*, 926 A.2d 1106, 1120 (D.C.2007)

(two-year suspension for neglecting client's matters, dishonesty to client, and false statements to Bar Counsel). In particular, engaging in dishonest conduct "to cover up [other] misconduct is absolutely intolerable" and warrants a greater sanction. *In re Chapman,* 962 A.2d 922, 925 (D.C.2009) (per curiam).

We conclude that Martin's actions in this case warrant an eighteen-month suspension because his dishonesty was both protracted and intended to conceal or excuse earlier misconduct. In weighing the severity of Martin's dishonest conduct, we consider the "entire mosaic" of the attorney's practice as reflected in the record. *See In re Ukwu,* 926 A.2d at 1117 & n. 20. Following the end of the Cannon litigation, Martin sought to collect a grossly unreasonable fee in violation of Rule 1.5(a), which when combined with the fees charged by other attorneys involved in the same matter, amounted to 67% of the total award. Despite ESI's dispute of the attorneys' fees, Martin disbursed the settlement proceeds and failed to remove the funds to a separate trust account when ESI further disputed the fees in violation of Rules 1.15(a) and (c). Martin then engaged in a series of additional misconduct to conceal and excuse these earlier violations.

First, Martin falsely testified that Lindberg from the D.C. Bar Ethics Hotline had advised him not to place the disputed fees in a separate account, which we found to be a violation of Rule 8.4(c). Second, Martin falsely stated on his Virginia bar application that "[o]nce I received notice of the dispute, I placed the disputed funds into a separate interest bearing account," when in fact Martin did not place the funds in a separate account until December 2003, some eight months after he learned of a fee dispute. The false statement on the Virginia bar application is particularly ag-

gravating as it is in direct contradiction to the alleged advice from Lindberg. On one hand, Martin told Bar Counsel that Lindberg advised him not to return the disputed fees to a separate account because that would be comingling; on the other hand, he told the Virginia bar that he placed the disputed funds in a separate account, implying that he therefore fulfilled his ethical duties to avoid comingling. These two inconsistent (and false) statements reveal the duplicitous nature of Martin's actions as he attempted to hide and excuse his misconduct.

Third, after ESI obtained an award for $165,313.00 from ACAB, Martin refused to pay and instead undertook "fruitless" appeals to delay any payment, which we found to be a violation of Rule 1.16(d). The delay prejudiced his former client, causing ESI to settle for half the amount it was entitled to receive. Fourth, under the settlement agreement between Martin and ESI, ESI was required to withdraw its bar complaint against Martin, which we have found was an interference with the administration of justice in violation of Rule 8.4(d). Fifth, Martin amended his Virginia bar application to report that a bar complaint had been filed against him, but that "the client has requested that the Complaint be withdrawn." Martin did not reveal that the requested withdrawal was made only pursuant to a settlement agreement. Such conduct displays a "lack of straightforwardness" expected of attorneys. *In re Ukwu,* 926 A.2d at 1113 (internal quotation marks omitted).

Sixth, and perhaps most egregious, Martin substantially aggravated the serious nature of his dishonest conduct by suggesting that he would not retaliate against Bragagnolo for testifying before the Hearing Committee if Bar Counsel agreed not to prosecute some of the charges against him. In the ACAB award settlement

agreement between ESI and Martin, Bragagnolo had agreed that he would "not hereafter institute or prosecute any Suit or other proceeding against Martin ... or in any way aid, abet or cause the institution or prosecution of Suit ... arising from or relating to Enterprise Solutions Inc." Fearing that his testimony before the Hearing Committee may constitute a breach of the settlement agreement, Bragagnolo requested assurances from Martin that he would not retaliate for testifying. Martin refused to give any assurance. Subsequently, a fax sent by Martin's attorney to the Hearing Committee and Bar Counsel stated that Martin noted "there was no offer by Bar Counsel to drop any of the charges against him in exchange for him making a concession with respect to the settlement agreement that would assist Bar Counsel's case." Martin's veiled attempt to bargain with Bar Counsel to drop charges in return for Bragagnolo's testimony reveals Martin's willingness to interfere with the Bar's regulation of the legal profession. This cannot be tolerated.[25] We note, in mitigation, that Martin has never been subject to prior disciplinary action in twenty years of practice. Given the severity of the aggravating factors, however, an eighteen-month suspension is appropriate.

Although the Hearing Committee, Board, and Bar Counsel all agree that no cases involving comparable facts exist in this jurisdiction, and the choice of an appropriate sanction is not "an exact science," *In re Edwards*, 870 A.2d 90, 94 (D.C.2005), an eighteen-month suspension is consistent with our other cases involving a similar level of dishonesty. *See In re Tun*, 26 A.3d 313, 314 & n. 1 (D.C.2011) (per curiam) (Eighteen-month suspension

for charging unreasonable fee, false statement to tribunal, dishonest conduct, and interfering with administration of justice); *In re Midlen*, 885 A.2d 1280, 1292 (D.C. 2005) (Eighteen-month suspension for misappropriation compounded by dishonesty); *In re Kitchings*, 857 A.2d 1059, 1059 (D.C. 2004) (per curiam) (Eighteen-month suspension for negligent conduct, harm to clients, and a "number of violations over a protracted period of time."); *In re Hallock*, 702 A.2d 1258, 1259 (D.C.1997) (per curiam) (In reciprocal disciplinary action, eighteen-month suspension for charging an unreasonable fee in violation of Rule 1.5 and dishonesty prejudicial to the administration of justice in violation of Rule 8.4.); *In re Morrissey*, 648 A.2d 185, 190 (D.C. 1994) (per curiam) (In reciprocal disciplinary action, eighteen-month suspension for "dishonesty and numerous instances of litigation misconduct."); *In re Lenoir*, 585 A.2d 771, 774 (D.C.1991) (per curiam) (Eighteen-month suspension for repeated dishonesty in representing two clients.).

Because Martin's delaying actions following the ACAB award caused ESI to settle for half the amount of the arbitration award, both the Hearing Committee and the Board recommend, as a condition to reinstatement, disgorgement of the remainder of the ACAB award with pre and post-judgment interest. The Board recommends that the funds be paid to ESI, if ESI has not already been paid by the Client's Security Fund, but if ESI is no longer in existence or has already been compensated by the Client's Security Fund, funds should be disgorged to the Client's Security Fund.

Martin argues that disgorgement is inappropriate because ESI relinquished half

---

**25.** A respondent may certainly litigate vigorously against Bar Counsel and may engage in negotiated discipline. *See, e.g., In re Rigas*, 9 A.3d 494 (D.C.2010). In this case, however,

Martin's action was akin to blackmailing Bar Counsel to drop charges in return for Bragagnolo's testimony, which was central to the disciplinary proceedings against Martin.

the ACAB award pursuant to a full and fair settlement agreement. We cannot agree. First, the Board adopted ACAB's findings that the $165,313.00 arbitration award represented the unreasonable portion of Martin's fee, which Martin is not entitled to receive or retain under Rule 1.5(a). ESI's willingness to settle for half the arbitration amount does not reduce the unreasonable portion of Martin's fee. *See In re Haar*, 667 A.2d at 1354–55 (willingness to compromise does not establish admission to liability). Second, permitting Martin to keep half of the arbitration award would "allow[ ] him to profit from his unethical behavior." *In re Hager*, 812 A.2d 904, 922 (D.C.2002). Thus, we adopt the Board's recommendation and rule that "disgorgement should be imposed as a 'reasonable condition' of reinstatement." *Id.*

Accordingly, it is ORDERED that respondent Kenneth A. Martin be, and he hereby is, suspended from the practice of law in the District of Columbia for a period of eighteen months, with reinstatement conditioned upon compliance with D.C. Bar Rule XI § 16(d) as set forth above.

